UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| DOUGLAS GROSSO, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 1:12-cv-00327-GZS |
| | ) | |
| AETNA LIFE INS. CO., et al., | ) | |
| | ) | |
| Defendants | ) | |

**RECOMMENDED DECISION**

Douglas Grosso sued Aetna Life Insurance Company (Aetna) and his Long Term

Disability Group Plan, pursuant to the Employee Retirement Income Security Act of 1974

(ERISA), 29 U.S.C. § 1132(a)(1)(B).   Pending are the cross-motions of Grosso and Aetna for

judgment on the record.   (ECF Nos. 30, 31.)   Grosso argues in his motion that Aetna's denial of

his application for benefits was arbitrary and capricious, i.e., not supported by substantial

evidence.   Grosso also asks the court to find that he meets the criteria for disability benefits under

the plan.   It is undisputed that Grosso has systemic lupus erythematosus, referred to below as

lupus, and he has self-reported chronic fatigue along with several other symptoms.   Aetna does

not dispute that Grosso has lupus, that he experiences chronic fatigue and cognitive difficulties,

and that objective measures of fatigue are not possible in the current state of medicine.   Rather,

Aetna argues that Grosso has failed to provide objective evidence of functional impairment.   The

dispute concerns whether there is substantial evidence in the medical record to support Aetna's

finding that, despite Grosso's lupus, chronic fatigue, and other symptoms, he is not disabled as

defined under the plan.   I conclude that substantial evidence for Aetna's decision is lacking, but I

decline to recommend that the court find based on the current record that Grosso is disabled.   I

recommend that the court deny Aetna's motion, grant Grosso's motion in part based on a lack of

substantial evidence for its finding that Grosso is not disabled from his own occupation, and remand the case to the claims administrator for a new review of Grosso's claim.

## FACTS

### 1. Grosso's Employment History, the Plans, and Aetna's Decisions

Grosso worked for Johnny's Selected Seeds from 1995 to 2008 and was Chief Information Officer and Director of Administrative Services.   (Administrative Record ("R.") 59, 619.)   In that position, he served "as a member of the Senior Management team responsible for all aspects of accounting, human resources, information services, and data security for Johnny's Selected Seeds."   (R. 619.)   Before working at Johnny's Selected Seeds, Grosso worked as a manager and driver for an oil company, a manager of a day program for persons with intellectual disabilities, and a manager of a small group of computer professionals at a bank.   (R. 517.)   Grosso has a B.A. in accounting.   (R. 516.)   As of December 2008, his annual salary was $91,810.   (R. 634.)

Aetna issued a group policy of insurance to fund benefits under a long-term disability plan for Johnny's Selected Seeds.   (R. 1-58, 121.)   Aetna is a fiduciary with "complete authority to review all denied claims for benefits under this policy," according to the terms of the plan.   (R. 58.)

Grosso left work in December 2008 due to lupus, depression, anxiety, and fatigue.   (R. 121.)   Aetna granted Grosso short-term disability benefits through April 2009.   (R. 121.)   In June 2009, Aetna sent Grosso a letter stating that it had found Grosso to be totally disabled from his own occupation, and that Aetna had approved up to twenty-four months of long-term disability.   (R. 633.)   In its letter approving up to twenty-four months of disability benefits, Aetna explained to Grosso that under the long-term disability plan, the term "disabled" has a different meaning before and after the first twenty-four months of disability.   As to the first twenty-four months, the plan states: "[Y]ou will be deemed to be disabled on any day if . . . you are

2

not able to perform the material duties of your own occupation solely because of" disease or injury

and "your work earnings are 80% or less of your adjusted predisability earnings."   (R. 4)

(emphasis omitted).   As to the period after the first twenty-four months, the plan states:   "[Y]ou

will be deemed to be disabled on any day if you are not able to work at any reasonable occupation

solely because of" disease or injury.   (R. 4) (emphasis omitted).   The term "reasonable

occupation" is defined in the plan as "any gainful activity for which you are; or may reasonably

become; fitted by: education; training; or experience; and which results in; or can be expected to

result in; an income of more than 80% of your adjusted predisability earnings."   (R. 17) (emphasis

omitted, original punctuation retained).   Aetna's letter stated:

> If you are still disabled from your own occupation and eligible for disability
> benefits on June 15, 2011, your plan requires that you meet a more strict "any
> occupation" definition of disability.   To qualify for monthly benefits, you must
> provide objective medical evidence that you are unable to perform any reasonable
> occupation for which you are qualified or could become qualified as a result of your
> education, training or experience.

(R. 633.)

Social Security awarded Grosso disability income effective June 2009.   (R. 648.)   Aetna

notified Grosso that it would offset his monthly benefit by the amount of his Social Security

benefit.   (R. 648.)

In September 2011, Aetna denied Grosso long-term disability benefits beyond the first

twenty-four months.   (R. 1009-12.)   In its notification and explanation of the termination of

benefits, Aetna acknowledged that "[a] lack of sustained work ability was medically supported

through February 2011," although Aetna also noted that Grosso's functional capacity was unclear

as of an exam he had back in August 2010.   (R. 1010.)   After a peer review of the file, Aetna

acknowledged that Grosso had cognitive difficulties and fatigue, but in September 2011, it

concluded nonetheless that there was "not support of an impairment severe enough" to preclude

his working full-time at his own occupation as a chief information officer.   (R. 1010.)

Aetna told Grosso that he could appeal the decision to terminate his benefits, and if he did appeal, Aetna would

> need objective medical information supporting restrictions and limitations which would preclude [Grosso] from performing the duties of any occupation.   Such objective information could include, but is not limited to, a detailed narrative report, outlining in objective terms the specific physical limitations and restrictions inherent to your condition which your doctor has placed on you as far as gainful activity is concerned; physician's prognosis including current course of treatment, frequency of visits, specific medications prescribed; copies of office visit notes, diagnostic studies, such as test results, X-rays, laboratory data, and clinical findings.

(R. 1011.)

Grosso appealed the denial.   (R. 1035.)   In January 2012, Aetna rendered its final decision to terminate his long-term disability benefits, effective June 15, 2011, on the basis that there was "a lack of physical and psychological findings to support [his] inability to work at any reasonable occupation."   (R. 1112.)   Aetna acknowledged that Grosso had been diagnosed with lupus, fatigue, depression, and anxiety, and it did not dispute those diagnoses.   (R. 1109-12.) Rather, the denial was focused on Aetna's determination that Grosso had not demonstrated functional impairment.   (R. 1111.)   Aetna acknowledged that Grosso had been awarded Social Security disability income, but Aetna explained that it gave little weight to that determination due to differences in the way the two benefit systems are analyzed and the information available to each, and due to the fact that Aetna did not know the basis for the Social Security determination. (R. 1112.)

Aetna's final denial contained an error in that it told Grosso that under the plan, the term "reasonable occupation" was one that yielded an income of more than 60% of his adjusted predisability earnings.   (R. 1107.)   It is undisputed that the correct percentage was 80% rather than 60%.   (Aetna's Opposition at 15.)

Grosso filed his complaint in this court in October 2012.   (ECF No. 1.)

**2. The Medical Record and Evidence of Impairment**

I review the medical record to determine whether it contains substantial evidence to support Aetna's finding that Grosso's functional impairment was not severe enough to preclude his full-time work in any occupation.

### a. The medical record on which Grosso relies

In December 2008, Dr. Raph, who was Grosso's treating doctor of internal medicine, reported that Grosso experienced "extreme fatigue" during a lupus flare-up, noting this on Aetna's physician statement in a section for "[o]bjective findings that substantiate impairment."   (Record at 485-86.)   Other symptoms were "difficulty concentrating," increased sleep and decreased "pleasure in things."   Dr. Raph noted that "stress of work" contributed to the symptoms.   (R. 486.)   Although Aetna's statement of facts states that the lupus flare-up is "secondary to depression, anxiety, fatigue and work related stress" the doctor listed the lupus flare-up as the primary diagnosis, with depression, anxiety, and fatigue as secondary to the lupus.   (R. 485.)   Dr. Raph stated that Grosso was capable of working at most one hour per day for two days a week. (R. 486.)

At an office visit in February 2009, Dr. Raph described Grosso's fatigue as "multifactorial" which "could be lupus, could be depression, could be anemia causing some of the issues but he has also had elevated liver enzymes and bilirubin."   (R. 503.)   In April 2009, Dr. Raph noted that Grosso was complaining of excessive fatigue and inability to concentrate for more than thirty minutes at a time.   (R. 501.)   In late April, Dr. Raph stated: "I don't feel he can continue with his work at the present time because of his severe fatigue which is probably multifactorial."   (R. 504.) In June 2009, when Aetna granted up to twenty-four months of long-term disability, it told Grosso

that it may contact him for a vocational rehabilitation consultation.   (R. 633.)   It appears that Aetna did not follow through with this.

Andrew Hertler, M.D., who was Grosso's treating hematologist, reported in April 2010 that Grosso had chronic incurable lupus.   (R. 770.)   Aetna repeatedly extended his short-term disability benefits, eventually through exhaustion of benefits.   (R. 123.)   Although there is discussion in the medical record of a liver condition, it was determined not to be disabling.   (R. 672-73.)

In July 2010, Grosso's treating rheumatologist, Fadi Ajine, M.D., reported that Grosso had "no sustainable work capacity due to lupus."   (R. 216.)   In Dr. Ajine's notes from that period, in response to a question on Aetna's form as to whether Grosso was motivated to return to work, Dr. Ajine stated, "no due to frustrations from his cognitive limitation."   (R. 751.)   Aetna's notes state that Dr. Ajine reported: "His chronic fatigue is responsive to steroids which suggest[s] an underlying immunological process associated with lupus."   (R. 253.)[1]   Dr. Ajine reported that leukopenia and thrombocytopenia were objective findings that substantiated impairment.   (R. 751.)

Also in July 2010, Dr. Hertler, the hematologist, reported that in his opinion Grosso was completely disabled by chronic fatigue stemming from lupus.   (R. 913.)   In August 2010, Grosso was evaluated by Lawrence Strohmeyer, D.O., whose letterhead indicates that at that time he was a licensed psychiatrist.   (R. 960.)   Dr. Strohmeyer noted that Grosso's mental status "is prominently obsessive compulsive and presents a time intense challenge," and that he spent ninety minutes face-to-face with Grosso "with extensive coordination of care secondary to cognitive impairment."   (R. 961, 962.)

---

[1]   Dr. Ajine noted lupus as a primary diagnosis, with chronic fatigue as a secondary diagnosis.   (R. 750.) Aetna again inaccurately stated in its memorandum that lupus was secondary to chronic fatigue.   (Aetna's Statement of Facts ¶ 36.)

In October 2010, John Pier, M.D., conducted a disability evaluation of Grosso.   (R. 980.) Dr. Pier appears to have a specialty in physical medicine and rehabilitation.   He gave the following assessment: "Chronic fatigue with a presumptive diagnosis of systemic lupus erythematosus" and "[c]ognitive difficulties per patient report, question systemic lupus erythematosus versus depression related."   (R. 982.)   He indicated as well that Grosso's "chronic fatigue had been responsive to steroid therapy over the last 6 months."   (R. 982.)   Dr. Pier appears to echo Dr. Ajine's comment that when fatigue is responsive to steroids, this indicates that the fatigue may be a response to lupus.   (R. 253, 982.)   In spite of Grosso's positive response to steroids for his fatigue, Dr. Ajine recommended that he go off steroids due to the limited, temporary benefit and the risk in light of another condition that Grosso had.   (R. 923.)   Dr. Pier gave the following assessment concerning Grosso's work capacity:

> He does not appear to maintain the capability of working full time.   He clearly has a diagnosis which would last greater than 12 months.   I would agree with his primary care I do not see him participating as an executive or in areas of accounting and administration.   He simply does not appear to have the mental or physical energy to accomplish these tasks.   Whether he could have more menial tasks and succeed in a less stressful and less high-paced position would be more debatable. Clearly he would not appear to be "reliable" on a daily basis.   If he were able to flex his own hours and pace his day, he likely could maintain some semblance of employability.   I would agree he is permanently and totally disabled from his previous position.   I do not believe he is permanent[ly] disabled from any occupation, especially if it can be done part time. . . .   Any occupation he would be able to perform at this time would be more self-paced and require a very accommodating employer and a much lower physical and cognitive expectation.

(R. 983.)   Dr. Pier specifically noted that he had "no compelling reason to discount the opinions of [Grosso's] primary rheumatologist," Dr. Ajine, on whose opinion Dr. Pier relied in part.   (R. 983.) In February 2011, Dr. Ajine again reported that Grosso had "no work capability due to chronic fatigue [and] cognitive dysfunction partly due to [Grosso's lupus]."   (R. 919.)

In May 2011, Rich Charlebois, D.O.,[2] who was Grosso's primary care physician, reported that Grosso could not work at all due to "lupus, generalized anxiety, [and] extreme fatigue," and this was expected to continue for Grosso's lifetime.   (R. 988, 1006.)   However, in June 2011, Dr. Charlebois checked a box on a form provided by Aetna indicating that Grosso was capable of some undetermined amount of sedentary work.   (R. 992.)   Apparently Dr. Charlebois did not provide an answer to question two on the form, which asked whether Grosso had any specific restrictions and limitations such as the amount of time he could spend sitting, standing, and walking during an eight-hour day.   (R. 992.)   Question three asks Dr. Charlebois to explain his rationale if his conclusion is that Grosso lacks the capacity to return to work full-time.   (R. 996.)   Dr. Charlebois did not answer this last question but simply signed the form.   (R. 996.)

### b. The medical record on which Aetna relies

Aetna states that Grosso submitted an incomplete functional capacity evaluation in July 2010, and after that, Aetna asked Grosso several times to complete the evaluation.   (Aetna's Statement of Facts ¶ 38; R. 759-61.)   I do not see clear evidence in the record citations provided by Aetna that Aetna communicated this request to Grosso, although it appears this was communicated internally within Aetna and possibly to the facility that conducted the evaluation. (Aetna's Motion at 9 n.8; R. 216, 221, 257, 274, 300.)

Aetna's internal review concluded that Grosso's reports of chronic fatigue and cognitive difficulties were not "objectively supported."    (R. 305.)   Aetna determined that a "peer review with occupational medicine" was warranted, but "peer outreach" was not practical.   (R. 305.) Aetna engaged Siva Ayyar, M.D., to review the medical documentation.   (R. 989-91.)   Dr. Ayyar's report relies heavily on assertions about Dr. Pier's evaluation.   It appears that her

---

[2]      Aetna states that Dr. Charlebois's first name is Eugene.   (Aetna's Statement of Facts, ¶ 34, ECF No. 30-1.) On the medical documents, he is referred to as Rich Charlebois, D.O.   (R. 1006.)

8

reference to him as a treating physician is incorrect.   (R. 980, 990.)   Dr. Ayyar's report also refers to a number of laboratory reports that indicated normal or near normal results.   She concluded that "the medical documentation does not support impairment of a severity which would preclude Mr. Grosso from returning to his usual and customary sedentary work as a chief information officer." (R. 990.)   She concluded that Grosso's inability to work is explained by his "cognitive and psychiatric states as opposed to a function of his medical diagnoses," and he simply lacks "personal motivation, tolerance and drive."   (R. 990-91.)

Aetna sent Dr. Ayyar's report to Dr. Ajine and Dr. Charlebois for their responses, stating that if they did not respond within fifteen days, Aetna would interpret that as agreement with Dr. Ayyar's report.   Dr. Ajine signed at the bottom of Aetna's letter, apparently indicating agreement with Dr. Ayyar's report.   (R. 997.)   Dr. Charlebois did not meet Aetna's fifteen-day deadline but, as discussed below, he submitted a later report on which Grosso relied for his appeal.     (R. 1006.)

As part of Aetna's final review following Grosso's appeal of its initial denial, Aetna engaged three additional experts.   Paul Howard, M.D., an internist and rheumatologist, concluded that (1) "[t]here is no evidence that [lupus] has any objective sequelae and is not resulting in functional impairment," and (2) "his functional capacities are self reported and are not supported by the objective records."   (R. 1122.)   He noted that the history of Grosso's lupus was "not well documented."   (R. 1122.)   Dr. Howard concluded that due to a lack of objective measures of fatigue and cognitive impairment, Grosso was not precluded from working in any occupation, and he was capable of working forty hours a week without restrictions.   (R. 1122-23.)   Aparna Dixit, Psy.D., concluded that "[a]s psychiatric impairment is not substantiated, no restrictions or limitations apply."   (R. 1130.)   Lodovico Balducci, M.D., a hematologist, concluded that Grosso did not suffer any impairment "from a hematological standpoint," but he took care to point out that

his review did not include issues of fatigue or lupus other than to note that fatigue "has been a consistent report in the claimant's chart."  (R. 1103.)

### c. The medical record in support of Grosso's administrative appeal

Dr. Ajine's later medical notes call into doubt whether he understood that his signature on Aetna's August 2011 letter would be interpreted as indicating his agreement with Dr. Ayyar's report.  (R. 997, 1031.)   In an October 2011 letter from Dr. Ajine, he acknowledged that he was asked to assess whether he agreed with the assessment of "another provider," and he responded that he "was not able to elaborate any further," but that Grosso's condition was unchanged.   (R. 1031.)   Aetna's reviewing physician, Dr. Howard, had a conversation with Dr. Ajine and reported that Dr. Ajine recognized that it is difficult to assess self-reported fatigue and cognitive impairment and "there were no objective findings to support impairment" based on lupus.   (R. 1121.)   However, Dr. Howard reported that Dr. Ajine felt "that the cognitive issues and fatigue were nonetheless symptoms that the claimant reported to him that were resulting in disability." (R. 1121.)

In September 2011, Dr. Charlebois referred Aetna to his medical notes when asked to respond to Dr. Ayyar's report.   (R. 1013.)    Dr. Charlebois stated in his medical notes for both September and October 2011:

> Ongoing active disease.   In summary, I think his physical limitations are intermittently severe enough to keep him out of the work force, but usually not so severe that this would be the case.   That being said, I suspect the psychological and cognitive consequences of his medical illness are severe enough most of the time to keep him out of any type of work that would require clear thinking, and executive organizational skills.   I think it would be in Mr. Grosso's best interest to have a neuro psych eval to address his deficiencies in this regard in a more objective manner.

(R. 1008, 1022.)   In October 2011, Ronald Hart, M.D., reported that Grosso was under his care for lupus.   (R. 1032.)   He reported that Grosso's "fatigue cognitive dysfunction and risk of bleeding

10

and infection are all caused by the lupus and significantly impair his functional ability." (R. 1032.) In the same month, Dr. Strohmeyer reported that Grosso "remains at high risk and will continue to be totally disabled for the foreseeable future." (R. 1034.)

Dr. Charlebois referred Grosso to Margaret Zellinger, Ph.D., for a neuropsychological evaluation of the "psychological and cognitive consequences of his medical illnesses . . . ." (R. 1071.) Dr. Zellinger reported that Grosso gave a good effort in the evaluation such that she considered the results valid, and he was at about midlevel functioning on the day of the examination. (R. 1071.) She reported that Grosso "perceives his cognitive decline as more severe and pervasive than it is." (R. 1072.) She reported that Grosso's "cognitive abilities are in many ways still strong, and at his best, he is able to think clearly and demonstrate executive skills such as organization and complex problem solving. However, he was somewhat inconsistent, and his isolated poor scores indicate he would not do well in a position that required sustained attention to detail or where minor errors would have significant consequences (financial or physical danger)." (R. 1074.) She concluded that "it would be surprising if he could maintain employment with a standard 40-hour work week," although she thought he might be able to work if he had flexible hours, could pace himself, take breaks as needed, and not work on days when his physical symptoms flared. (R. 1074.)

Grosso also submitted a functional capacity evaluation, although he does not mention this in his statement of facts or argument. (R. 392, 1075.) The report states that (1) Grosso "gave maximal effort on most test items;" (2) the "[f]unctional limitations noted are consistent with physical impairments and diagnosis of fibromyalgia and [lupus]"; and (3) due to Grosso's diagnoses, his "symptoms and ability may vary" from day to day. (R. 1076.) On this examination, the reporter stated that Grosso overestimated his abilities compared with the

objective findings.   (R. 1076.)   He self-reported fatigue that typically varied from day to day and over the course of the day.   (R. 1086.)

## LEGAL STANDARD

It is undisputed that the ERISA plan at issue in this case provides Aetna with the discretion to determine eligibility for benefits.   Consequently, this Court must uphold Aetna's decision unless it is arbitrary, capricious, or an abuse of discretion.   See Cusson v. Liberty Life Assurance Co. of Boston, 592 F.3d 215, 224 (1st Cir. 2010) (citations omitted).   "In other words, the administrator's decision must be upheld if it is reasoned and supported by substantial evidence. Evidence is substantial if it is reasonably sufficient to support a conclusion, and the existence of contrary evidence does not, in itself, make the administrator's decision arbitrary."   Gannon v. Metropolitan Life Ins. Co., 360 F.3d 211, 213 (1st Cir. 2004) (citation omitted).

"On the other hand, an administrator's faulty reasoning and mischaracterization of the evidence will not survive an 'arbitrary and capricious' standard of review simply because some evidence in the record supports the ultimate decision."   McGahey v. Harvard Univ. Flexible Benefits Plan, 685 F. Supp.2d 168, 177 (D. Mass. 2009) (citing Buffonge v. Prudential Ins. Co. of Am., 426 F.3d 20, 30-31 (1st Cir. 2005)).   "An administrator's decision must be 'reasoned' to survive 'arbitrary and capricious' review, Gannon, 360 F.3d at 213, and we cannot say that a decision relying on multiple pieces of faulty evidence was 'reasoned.'"   Buffonge, 426 F.3d at 30 (citing Gannon, 360 F.3d at 214-15).

## DISCUSSION

The parties' arguments concern (1) whether substantial evidence supported Aetna's denial of benefits and (2) whether Aetna's structural conflict of interest motivated the denial of benefits.

## A. The Record Evidence

The issues here are straightforward in spite of the complexity of the medical record.

Aetna does not dispute (1) that Grosso has lupus, (2) that he has self-reported fatigue that varies from day to day and over the course of the day, (3) that his complaint of fatigue appears throughout the medical record, and (4) that medical providers have endorsed rather than dismissed his complaint of fatigue while acknowledging that there is no objective way to measure fatigue. Aetna's denial was not based on any rejection of the medical reports of fatigue or the diagnosis of lupus, even though one of its reviewing physicians noted that the lupus was not well-documented. Rather, Aetna concluded that notwithstanding Grosso's subjective reports of chronic fatigue, the medical record did not support a finding that he was functionally impaired enough to be considered disabled under the plan.   I conclude that although there appears to be evidence in the record that supports Aetna's conclusion, the decision is nevertheless not supported by substantial evidence as to either evidence in the medical record concerning functional impairment or evidence that Grosso was capable of full-time work at 80% of his prior earnings.

It is Grosso's burden to demonstrate that his fatigue is severe enough to cause him to be disabled.   See Tsoulas v. Liberty Life Assurance Co. of Boston, 454 F.3d 69, 78 (1st Cir. 2006). Aetna correctly points out that it is permitted to require objective evidence of impairment, and it is not required to make a finding of disability based solely on unsupported subjective reports from the claimant.   The First Circuit has held, in a case involving symptoms of chronic fatigue, that "[w]hile the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis."   Boardman v. Prudential Ins. Co. of Am., 337 F.3d 9, 16 n.5 (1st Cir. 2003).

Grosso's award of Social Security disability income does not constitute "controlling weight" in the determination whether there was substantial evidence to support Aetna's denial of benefits.   See Pari-Fasano v. ITT Hartford Life and Accident Ins. Co., 230 F.3d 415, 420 (1st Cir.

13

2000).   In Pari-Fasano, the First Circuit held "that benefits eligibility determinations by the Social

Security Administration are not binding on disability insurers," because "[t]he criteria for

determining eligibility for Social Security disability benefits are substantively different than the

criteria established by many insurance plans . . . ."   Id.   Grosso does not make any comparison

between Social Security criteria and the plan at issue here.

      Grosso's functional capacity evaluation, which he obtained in response to Aetna's request,

supports Aetna's denial of the claim to the extent the claim relates to total disability from any

reasonable sedentary occupation.   Grosso's functional capacity evaluation states, in the section on

limitations, that the only two limitations are crawling and crouching.   (R. 1077.)   The list of

abilities and strengths is much longer and includes sitting, standing, walking, stair climbing with

the use of a hand rail, along with other movements.   (R. 1077.)   This suggests that Grosso's

functional impairment may not be severe enough to render him disabled from any occupation

where he could earn 80% of his prior earnings.   However, the report also states that due to

Grosso's diagnoses, his "symptoms and ability may vary" from day to day.   (R. 1076.)   Aetna's

conclusion, as set forth in its final decision, that he could work full time at any occupation,

including his prior position at Johnny's Selected Seeds (R. 1111) is not supported by substantial

evidence.   I conclude that Aetna relied largely on faulty reasoning or mischaracterization of the

medical record with respect to its ultimate conclusion.   See Buffonge, 426 F.3d at 30.

      The first of these is Dr. Ayyar's conclusion that Grosso simply lacked motivation and

drive.   Dr. Ayyar made this comment as she was discussing Dr. Pier's evaluation that Grosso

lacked "'mental or physical energy to accomplish'" the tasks he used to do.   (R. 983, 990.)   Dr.

Ajine did comment that Grosso lacked motivation, but he linked this to Grosso's frustration with

his cognitive limitations, not his reported fatigue.   (R. 751.)   Aetna does not deny that there is a

medical and psychological complex of symptoms and conditions, including anxiety, depression,

obsessive-compulsive spectrum disorder, and some minimal cognitive impairment, that permeate this medical record.   (R. 485, 962.)   Dr. Ayyar's conclusion that all Grosso lacks is "personal motivation, tolerance and drive" appears reductionist to the point of being unreasonable when viewed in the light of the reports on which she bases this conclusion.

There is also evidence that Grosso obsessed about his symptoms and in so doing amplified them beyond what his medical providers thought was warranted.   However, these observations were made in the context of a clinical discussion of his obsessive-compulsive traits.   These observations were not accompanied by any discussion that the only thing Grosso lacked was motivation and drive, or for that matter any suggestion that his medical complaints were driven by secondary gain.   Furthermore, subsequent reports did not confirm Dr. Ayyar's assessment that all Grosso lacked was motivation and drive.   Dr. Zellinger commented that Grosso made a good faith effort to perform as well as he could during her examination.   Likewise the functional capacity evaluation reveals that Grosso gave maximum effort and that he actually overestimated his physical ability.   Aetna did not subsequently discount Dr. Ayyar's assessment in the face of later-obtained information that conflicted with it and instead relied upon Ayyar's assessment to support its conclusion that Grosso was not disabled from his own occupation, a conclusion that has no medical record support except for Ayyar's assessment.

The second of Aetna's conclusions that I believe mischaracterizes the record is Aetna's statement that Grosso's treating rheumatologist, Dr. Ajine, agreed with the conclusions of Aetna's reviewing physician, Dr. Ayyar.   (Aetna's Motion at 6-7.)   Dr. Ajine's October 2011 letter suggests that he stood by his previous conclusions except to add that Grosso was experiencing additional joint pain.   (R. 1031.)   Although I suppose it is possible to interpret Dr. Ajine's letter as deferring on the issue of Dr. Ayyar's conclusions and thereby somehow concurring by implication, that seems like a stretch, particularly in light of Dr. Howard's conversation with him

15

in which he reported that Grosso was disabled by a combination of fatigue and cognitive impairment.   I do not think it is fair to characterize Dr. Ajine's letter as endorsing Dr. Ayyar's conclusions.

The third of Aetna's conclusions is that the reports of Dr. Ayyar and Dr. Howard provide a sound basis for finding that the medical record lacks objective evidence of functional impairment based on fatigue.   Both were asked to review the medical record for functional impairment.   (R. 990, 1121-23.)   Dr. Howard stated that "[Grosso's] functional capacities are self reported and are not supported by the objective records."   (R. 1122.)   However, as the First Circuit has noted, chronic fatigue may not lend itself to objective clinical findings.   Boardman, 337 F.3d at 16 n.5. Consequently, I think it is fair to say that treating physicians' reports of patient chronic fatigue are typically based on subjective reporting by patients, and those reports may very well not contain objective evidence of the functional impairment, if any, that might be caused by fatigue.   For a reviewing physician such as Dr. Howard to emphasize that treating physicians' reports and laboratory test results do not contain objective evidence of functional impairment implies that one would actually reasonably expect to find it permeating those reports and laboratory test results.   I do not believe that is a fair expectation.

In fairness to the reviewing doctors, they tried to answer the questions Aetna posed to them.   The flaw in Aetna's method of review was to treat diagnoses, symptoms, and laboratory test results as proxies for functional impairment.   Aetna did what it prohibited Grosso from doing. Just as Grosso was not permitted to make the conceptual leap from the underlying medical facts in his record to the conclusion that he is functionally impaired and disabled, so Aetna may not make the same conceptual leap to reach the opposite conclusion.   Aetna's whole point, which is valid, is that functional impairment must be assessed directly.   The problem is that it did not follow its own prescribed methodology.   Instead, by noting the lack of objective evidence of functional

16

impairment in numerous places in the medical record where one would not reasonably expect to find that evidence, Aetna appears to paintball the medical record and obfuscate the issue.   I conclude that Aetna's reliance on this reasoning was flawed.

I note that Dr. Balducci, who was one of the reviewing physicians, opined that Grosso was not impaired from a strictly hematological perspective, but he acknowledged that as to impairment from fatigue, he "cannot really comment on that other than to say that the fatigue has been a consistent report in the claimant's chart."   (R. 1103.)   Thus, Dr. Balducci appropriately explained the limits of his review, which explicitly did not address the issue of fatigue as a cause of functional impairment.

Aetna was within its rights to accept that Grosso has symptoms and diagnoses as reported by his treating physicians and instead to focus its decision-making solely on the presence or absence of objective evidence of functional impairment.   Aetna certainly invited responses from Grosso's treating physicians, particularly Dr. Ajine and Dr. Charlebois, concerning objective evidence of functional impairment.   (R. 918-19, 984-85, 992-96.)   However, as Dr. Ajine indicated in his response, he was not aware of any objective way to measure chronic fatigue and cognitive impairment.   (R. 985.)   The key issue in my review is determining whether Aetna's decision as to the lack of any significant functional impairment is supported by substantial evidence.   I cannot conclude that there is substantial evidence to support Aetna's decision when the reasoning behind that decision contains fairly significant weaknesses.   This is not a situation in which weak reasoning as to one part of Aetna's conclusion fails to undermine strong reasoning as to an independently sufficient basis for Aetna's conclusion.   See Buffonge, 426 F.3d at 30-31. Rather, the review approach taken by Aetna permeated its entire review process after the two-year long term disability period ended and undermines confidence in its conclusions as to the lack of any functional impairment that would preclude Grosso from returning to his prior occupation.

17

I also conclude that substantial evidence is lacking that Grosso has the functional capacity to work full-time at any reasonable occupation, including his prior employment, and earn an income of more than 80% of his adjusted predisability earnings as defined in the plan.   His annual income was $91,810.   Aetna did not address the specific issue of Grosso's salary, which was fairly high, and what he could do that would earn him 80% of that salary.   This is a significant omission given that all of the doctors who evaluated Grosso in person for work capacity, including both treating and nontreating physicians and psychologists, concluded that he either could not work full-time or could only work part-time under special conditions, or that he suffered from some cognitive impairment.   Aetna says its admitted error in its final decision, which states that Grosso could earn up to 60% of his prior earnings, is not significant because the objective evidence of functional impairment supports its conclusion that Grosso could return to his own occupation. (See Aetna's Response, ECF No. 33, at 12.)   That determination does not have substantial support in this record.   Aetna itself approved own-occupation long term disability payments for that prior occupation for two years based on the same medical record.   The only significant addition is the Ayyar report of "lack of motivation" which I have previously explained is not supported by the medical record when that record is viewed objectively.   I conclude that Aetna's faulty reasoning concerning the issue of functional impairment in the medical record does not just undermine its conclusion on functional capacity; it also undermines Aetna's conclusion that Grosso can earn 80% of his prior salary at any occupation, including his own prior occupation.

**B. Structural Conflict of Interest**

Grosso argues essentially that Aetna has a structural conflict of interest because it both determines whether to pay benefits and pays the benefits.   (Grosso's Motion at 7.)   Aetna argues that there is no evidence that a structural conflict of interest influenced its decision in this case. (Aetna's Motion at 33.)   Pursuant to Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 116-18

18

(2008), a structural conflict of interest is only one of many factors to be considered in determining whether there was an abuse of discretion under the circumstances of a particular case.   The conflict may be a significant factor when there is evidence of "a history of biased claims administration" but a less important factor when "the administrator has taken active steps to reduce potential bias and to promote accuracy . . . ."   Id. at 117.

I conclude that the appropriate way to analyze this case is to determine whether there is substantial evidence to support Aetna's decision, which I find there is not, as discussed above.   I do not make any specific findings regarding the structural conflict of interest and I do not believe that such findings are required in this case.

## C. Appropriate Remedy

I recommend denying Aetna's motion.   I recommend granting Grosso's motion in part, to the extent he requests a determination that Aetna's decision was arbitrary and capricious because it was not based on substantial evidence.   I recommend denying Grosso's motion in part, to the extent he requests a finding that he is entitled to benefits based on the record as it currently stands. See Buffonge, 426 F.3d at 31.   Rather, I conclude only that Grosso is entitled to a process that is not tainted by flawed reasoning and mischaracterization of the record as happened here.   See id. at 30-31.

This raises the question whether the appropriate remedy is to remand the matter to the administrator for a renewed evaluation or to award a retroactive reinstatement of benefits.   See id. at 31.   The First Circuit has held that the court has "'considerable discretion' to craft a remedy after finding a mistake in the denial of benefits."   Id. (quoting Cook v. Liberty Life Assurance Co., 320 F.3d 11, 24 (1st Cir. 2003)).   I recommend that the case be remanded for a renewed evaluation in which the parties are permitted to update and augment the current evidentiary record.

This will give both parties the opportunity to evaluate both Grosso's functional impairment and the issue of salary replacement directly, based on objective evidence.

**D. Attorney Fees**

Grosso has requested attorney fees.   (Grosso's Motion at 24.)   Neither party has briefed the issue.   Local Rule 54.2 provides that an application for attorney fees must generally await either the expiration of the time for filing a timely appeal or an appellate mandate.   The rule provides an exception applicable in Social Security cases involving remands for further administrative review, such that interim attorney fee requests in those situations may be considered.   A recent First Circuit decision affirmed an award of interim attorney fees to an ERISA claimant after the administrator had arbitrarily and capriciously denied long-term disability benefits and the court remanded the case to the administrator.   Colby v. Union Sec. Ins. Co., 705 F.3d 58, 68 (1st Cir. 2013), aff'g Colby v. Assurant Employee Benefits, 635 F. Supp.2d 88 (D. Mass. 2009)[3].   In another district court decision in the same case, also affirmed by the First Circuit, the district court noted that the First Circuit applies a "five factor test."   Colby v. Assurant Employee Benefits, 818 F. Supp.2d 365, 384-85 (D. Mass. 2011), aff'd, Colby, 705 F.3d at 68.   I refrain from making a recommendation on interim attorney fees at this point because the parties may understandably have been under the impression that the request would have to wait, and for that reason did not brief the issue.

---

[3]       The Colby case had a long and somewhat complicated procedural history, but ultimately the First Circuit affirmed with little comment the district court's initial decision to remand the case and award attorney fees on the remand because ultimately it affirmed the district court's retroactive reinstatement of benefits following the case's return after remand.   Colby v. Union Sec. Ins. Co., 705 F.3d 58, 68 (1st Cir. 2013), aff'g Colby v. Assurant Employee Benefits, 635 F. Supp.2d 88 (D. Mass. 2009).   It is significant that the district court noted in its original decision that the circuits appeared evenly split on this issue of whether a remand to the plan administrator entitled the plaintiff to prevailing party attorney fees.   635 F.Supp.2d at - 92-95 & nn. 6, 7.

**CONCLUSION**

Based on the foregoing, I recommend that the court deny Aetna's motion, grant Grosso's motion in part based on the lack of substantial evidence to support Aetna's decision, deny Grosso's motion to the extent he requests a finding of disability, and remand the matter to the claims administrator for a new review of Grosso's claim, in accordance with this recommendation. I recommend denying Grosso's request for attorney fees, without prejudice, in the event he wishes to bring that as a separate motion.

**Notice**

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

September 4, 2013                                        /s/ Margaret J. Kravchuk
                                                        U.S. Magistrate Judge